**COMP**
John P. Aldrich, Esq.
Nevada Bar No. 6877
**ALDRICH LAW FIRM, LTD.**
1601 S. Rainbow Blvd, Suite 160
Las Vegas, Nevada 89146
Telephone:  (702) 853-5490
Facsimile:   (702) 227-1975
*jaldrich@johnaldrichlawfirm.com*

Shannon L. Hopkins , Esq. *(pro hac to be submitted)*
Julia Sun, Esq. *(pro hac to be submitted)*
**LEVI & KORSINSKY LLP**
30 Broad Street, 24th Floor
New York, New York 10004
Telephone: (212) 363-7500
Facsimile:  (212) 363-7171
*shopkins@zlk.com*
*jsun@zlk.com*

*Attorneys for Plaintiff*

UNITED STATES DISTRICT COURT

DISTRICT OF NEVADA

| | |
|---|---|
| BORNET OLIVIER, on behalf of himself and all others similarly situated,<br><br>Plaintiff,<br><br>v.<br><br>WANCHUN HOU, QIANG LI, JIHONG BAO, XIN WANG, ALBERT LIU, REGIS KWONG, KOKHUI TAN, IRIS GENG, TINGJIE LV, ZHAOXING HUANG, DONG LI,and TRUNKBOW INTERNATIONAL HOLDING LIMITED,<br><br>Defendants. | CASE NO.<br><br>**INDIVIDUAL AND SHAREHOLDER CLASS ACTION COMPLAINT**<br><br>**CIVIL ACTION**<br><br>**JURY TRIAL DEMANDED** |

Plaintiff Bornet Olivier ("Plaintiff"), by his undersigned attorneys, alleges upon information and belief, except for his own acts, which are alleged on knowledge, as follows.

## NATURE OF THE ACTION

1.      As a shareholder of Trunkbow International Holding Limited ("Trunkbow" or the

1

"Company"), Plaintiff brings this shareholder class action on behalf of the public common stockholders ofTrunkbow seeking equitable relief for the breach of fiduciary duties by the Trunkbow Board of Directors (collectively, the "Board" or the "Individual Defendants") arising out of their ongoing efforts to sell the Company to insiders Wanchun Hou ("Hou") and Qiang Li ("Li"), through certain entities under their control, pursuant to an unfair price, an unfair process, and through a materially misleading recommendation statement. In addition, Plaintiff brings a claim on behalf of himself against Defendants for their violations of Section 14(a) and 20(a) of the Securities Exchange Act of 1934 (the "Exchange Act") and Rule 14a-9 promulgated thereunder ("Rule 14a-9").

2.    As directors and/or executive officers of Trunkbow, Hou and Li exercise actual control over the Company. Moreover, they currently beneficially own in the aggregate approximately 43.9% of the outstanding shares of the Company's common stock. Hou is the Chairman of the Company's board of directors (collectively, the "Board" or the "Individual Defendants") and beneficially owns approximately 23.25% of the Company's outstanding shares; Li is the Chief Executive Officer ("CEO") and a director of the Company, and beneficially owns approximately 20.64% of the Company's outstanding shares.

3.    On November 2, 2012, the Board announced that it had received a preliminary, non-binding proposal letter from Hou and Li to acquire all of the outstanding shares of common stock of the Company not currently owned by them for $1.46 per share in cash. In mid-February 2013, soon after the Company began to face a substantial decline in sales, Hou and Li suspended their proposal to acquire the Company. Yet, until December 2013, neither Trunkbow nor any other Defendant publicly disclosed that Hou and Li had determined to suspend their take-private proposal in early 2013.

4.     The Company announced on December 10, 2013 that they had entered into a definitive Agreement and Plan of Merger ("Buyout Agreement") under which Li and Hou, through Trunkbow Merger Group Limited ("Parent") and Trunkbow International Merger Sub Limited ("Merger Sub"), will acquire all of the outstanding shares of Trunkbow for $1.46 per share in cash (the "Proposed Buyout") – the same consideration proposed over a year ago.  The Proposed Buyout is valued at approximately $53.7 million.  Upon the completion of the Proposed Buyout, Hou and Li will indirectly hold approximately 52.97% and 47.03% of the surviving corporation.

5.     Board members have breached their fiduciary duties by agreeing to the Proposed Buyout for inadequate consideration. This is reflected by the fact that the Company's stock had been trading above the $1.46 per share consideration until May 2012, only a few months before the take-private offer was announced. Even Trunkbow's financial advisor, Duff & Phelps, LLC ("Duff & Phelps"), found Trunkbow's implied value to be as high as $1.59 per share based on certain analyses performed in support of its fairness opinion.

6.     The Board's decision to enter into the Merger Agreement comes at a time when the Company has recovered from its temporary setback earlier in 2013.  In fact, Trunkbow's stock has rose approximately 110% since June – from a 52-week low of $0.58 on June 20, 2013 to recently closing at $1.22 on December 6, 2013, just prior to the announcement of the deal. Indeed, Hou and Li acknowledge that they resumed the going-private proposal "in anticipation of the Company's improved business operations in the third quarter of 2013."

7.     The Proposed Buyout is the product of a materially flawed process and was not negotiated with the best interests of Trunkbow's stockholders in mind.  The Special Committee shopped the Company to 75 different parties, but knew that without the support of Hou and Li, it

would never be able to sell the Company.    Furthermore, the Special Committee and the Board acquiesced to Hou and Li when they wanted to end the process and when they decided to start the process again.

8.    Moreover, upon learning of Hou and Li's decision to resume the going-private process in fall of 2013, the Board approved the Merger Agreement in December 2013 without reaching out to any other potential bidders or strategic partners, and determined not to insist on a go-shop clause.

9.    The Individual Defendants have exacerbated their breaches of fiduciary duty by agreeing to lock up the Proposed Buyout with deal protection devices that coercively deterthe most likely bidders from making a successful competing offer for the Company. Specifically, pursuant to the Buyout Agreement, Defendants agreed to: (i) a strict no-solicitation provision that prevents the Company from soliciting other potential acquirers or even continuing discussions and negotiations with potential acquirers; (ii) a provision that provides Hou and Li with five(5) business days to match any competing proposal in the event one is made; and (iii) a provision that requires the Company to pay Hou and Li a termination fee of $1.25 million in order to enter into a transaction with a superior bidder. These provisions substantially and improperly limit the Board's ability to act with respect to investigating and pursuing superior proposals and alternatives, including a sale of all or part of Trunkbow. The deal protection devices in the Buyout Agreement work together to unfairly discourage competitive offers from potential buyers.

10.    Finally, as alleged herein, on December 20, 2013, Trunkbow filed a Preliminary Schedule 14A Proxy Statement (the "Proxy Statement")with the United States Securities and Exchange Commission ("SEC") in support of the Proposed Buyout. The Proxy Statement fails to

1  provide the Company's shareholders with material information and/or provides them with

2  materially misleading information thereby rendering the shareholders unable to make an

3  informed decision as to how to vote at the special shareholder meeting.  Defendants have

4  violated Section 14(a) and 20(a) of the Exchange Act and Rule 14a-9 promulgated thereunder,

5  and the Board has breached its fiduciary duty of candor by omitting material facts necessary to

6  render the Registration Statement non-misleading.

7         11.    The Individual Defendants have breached their fiduciary duties of loyalty, due

8  care, independence, good faith, candor, and fair dealing by failing to act in the best interest of

9  shareholders.  Plaintiff seeks to enjoin the Proposed Buyout unless and/or until Defendants cure

10  their breaches of fiduciary duty and disclose all material information concerning the Proposed

11  Buyout.

12                              **JURISDICTION AND VENUE**

13         12.    This Court has subject matter jurisdiction under 28 U.S.C. § 1331 (federal

14  question jurisdiction) as Plaintiff alleges violations of Sections 14(a) and Section 20(a) of the

15  Exchange Act, and Rule 14a-9 promulgated thereunder.

16         13.    This Court further has jurisdiction over this action pursuant to 28 U.S.C. §

17  1332(a) in that Plaintiff and Defendants are citizens of different states and the matter in

18  controversy exceeds $75,000.00, exclusive of interest and costs. Plaintiff is a citizen of

19  Switzerland, and no Defendant is a citizen of Switzerland.

20         14.    This action is not a collusive one to confer jurisdiction on a court of the United

21  States which it would not otherwise have.

22         15.    Venue is proper in this district because: (i) the conduct at issue took place and had

23  an effect in this district; (ii) Trunkbow is a corporation incorporated in this District; and (iii)

24

Defendants have received substantial compensation in this District by doing business here and engaging in numerous activities that had an effect in this District.

**THE PARTIES**

16.     Plaintiffis, and has been, at all relevant times, the owner of shares of Trunkbow common stock.  Plaintiff is a citizen of Switzerland.

17.     Trunkbow is a corporation organized and existing under the laws of the State of Nevada and maintains its executive offices at Unit 1217-1218, 12/F Twr B, Gemdale Plaza No. 91 Jianguo Road, Chaoyang District, Beijing F4 100022. Trunkbow is a mobile applications enabler, focused on providing telecom operators in China with application platforms on which to offer Mobile Value Added Services and Mobile Payment Solutions to their subscribers. Trunkbow's common stock trade on the Nasdaq Global Market under the symbol, "TBOW."

18.     Defendant Hou is a co-founder of the Company and has served as the Company's Chairman of the Board since February 10, 2010.

19.     Defendant Li is a co-founder of the Company and has served as the CEO and a director of the Company since March 1, 2010.

20.     Defendant Jihong Bao ("Bao") has served as a director of the Company since February 10, 2010.

21.     Defendant Xin Wang ("Wang") has served as a director of the Company since March 1, 2010.

22.     Defendant Albert Liu ("Liu") has served as a director of the Company since March 1, 2010.

23.     Defendant Regis Kwong ("Kwong") has served as a director of the Company since March 1, 2010.

24.     Defendant Kokhui Tan ("Tan") has served as a director of the Company since March 1, 2010.

25.     Defendant Iris Geng ("Geng") has served as a director of the Company since March 1, 2010.

26.     Defendant Tingjie Lv ("Lv") has served as a director of the Company since March 1, 2010.`

27.     Defendant Zhaoxing Huang ("Huang") has served as a director of the Company since February 10, 2010.

28.     Dong Li ("D. Li") has served as a director of the Company since February 10, 2010.

29.     Defendants Hou, Li, Bao, Wang, Liu, Kwong, Tan, Geng, Lv, Huang, and D. Li are collectively referred to as the "Individual Defendants" and/or the "Board." The Individual Defendants as officers and/or directors of Trunkbow, have a fiduciary relationship with Plaintiff and other public shareholders of Trunkbow and owe them the highest obligations of good faith, fair dealing, loyalty and due care.

## INDIVIDUAL DEFENDANTS' FIDUCIARY DUTIES

30.     By reason of Individual Defendants' positions with the Company as officers and/or directors, they are in a fiduciary relationship with Plaintiff and the other public shareholders of Trunkbow and owe them, as well as the Company, a duty of care, loyalty, good faith, candor, and independence.

31.     Additionally, when a board decides to undertake a sale of all or a majority of the Company, cashing out its shareholders, it has a fiduciary duty to undertake all reasonable efforts to secure the best value for the Company through the sale.

32.   To diligently comply with their fiduciary duties, the Individual Defendants may not take any action that:

(a)   Fails to maximize the value of the transaction for Trunkbow shareholders;

(b)   Adversely affects the value provided to the Company's shareholders;

(c)   Favors themselves or will discourage or inhibit alternative offers to purchase control of the corporation or its assets; and/or

(d)   Will provide the Individual Defendants with preferential treatment at the expense of, or separate from, the public shareholders.

33.   In accordance with their duties of loyalty and good faith, the Individual Defendants are obligated to refrain from:

(a)   Performing any action that may adversely affect the value of the transaction for Trunkbow shareholders;

(b)   Participating in any transaction where the Individual Defendants' loyalties are divided;

(c)   Participating in any transaction where the Individual Defendants receive, or are entitled to receive, a personal financial benefit not equally shared by the public shareholders of the corporation; and/or

(d)   Unjustly enriching themselves at the expense or to the detriment of the public shareholders.

34.   Plaintiff alleges herein that the Individual Defendants, separately and together, in connection with the Proposed Buyout, are knowingly or recklessly violating their fiduciary duties, including their duties of care, loyalty, good faith, and independence owed to Plaintiff and other public shareholders of Trunkbow.

## CLASS ACTION ALLEGATIONS

35.     Plaintiff brings this action as a class action pursuant to Rule 23 of the Federal Rules of Civil Procedure on behalf of all owners of Trunkbow common stock, excluding Defendants and their affiliates, immediate families, legal representatives, heirs, successors or assigns and any entity in which Defendants have or had a controlling interest (the "Class"). This action is properly maintainable as a class action under Rule 23(b)(a) and (b)(1) and/or (b)(2) for the reasons set forth herein.

36.     The putative Class is ascertainable and so numerous that joinder of all members is impracticable.  While the exact number of Class members is unknown to Plaintiff at this time and can only be ascertained through discovery, Plaintiff believes that there are thousands of members in the Class scattered throughout the United States and worldwide. As represented in the parties' Buyout Agreement, Trunkbow has approximately 36.8 million shares of common stock issued and outstanding. All members of the Class may be identified from records maintained by Trunkbow or its transfer agent and may be notified of the pendency of this action by mail, using forms of notice similar to that customarily used in securities class actions.

37.     Questions of law and fact are common to the Class, including:

(i)     Whether the Individual Defendants have breached their fiduciary duties to Plaintiff and other members of the Class in connection with the Proposed Buyout, including their duties of undivided loyalty, due care, good faith, honesty, and complete candor;

(ii)     Whether the Individual Defendants misrepresented and omitted material facts in the Proxy Statement in violation of federal laws, as well as their fiduciary duties owed to Plaintiff and the other members of the Class;

(iii)    Whether the Proposed Buyout is unfair, inadequate, unreasonable, and/or not in the best interest of Plaintiff and other members of the Class;

(iv)    Whether Defendants, in bad faith and for improper motives, impeded or erected barriers to discourage other strategic alternatives including offers from interested parties for the Company or its assets;

(v)    Whether the consideration under the Proposed Buyout unfairly and inadequately values Trunkbow;

(vi)    Whether Plaintiff and the other members of the Class would be irreparably harmed were the transactions complained of herein consummated; and

(vii)    Whether the Class is entitled to injunctive relief or damages as a result of Defendants' wrongful conduct.

38.    Plaintiff's claims are typical of those of the other members of the Class, and Plaintiff is not subject to any atypical defenses. Plaintiff and the other members of the Class have sustained damages as a result of defendants' wrongful conduct as alleged herein.

39.    Plaintiff is an adequate representative of the Class—he is committed to prosecuting this action, has no interests that are adverse to the Class, and has retained competent counsel experienced in litigation of this nature.

40.    The prosecution of separate actions by individual members of the Class would create the risk of inconsistent or varying adjudications that would establish incompatible standards of conduct for Defendants, or adjudications that would, as a practical matter, be dispositive of the interests of individual members of the Class who are not parties to the adjudications or would substantially impair or impede those non-party Class members' ability to protect their interests.

41.   Defendants have acted on grounds generally applicable to the Class, making appropriate final injunctive relief with respect to the Class as a whole.

## SUBSTANTIVE ALLEGATIONS

*Company Background and Hou and Li's Actual Control of the Company*

42.   Trunkbow is a mobile applications enabler, focused on providing telecom operators in China with application platforms on which to offer Mobile Value Added Services and Mobile Payment Solutions to their subscribers. In 2009, Trunkbow began its mobile payments platform throughout the province of Shandong, China.The Company has recently expanded its boundary,supplying its mobile payment solutions to all three Chinese mobile telecom operators, as well as re-sellers, in several provinces of China.

43.   Hou is the Company's Chairman of the Board and Li is the Company's CEO and a director.   Together, Hou and Li currently beneficially own approximately 43.89% of the outstanding shares of the Company's common stock, with Hou beneficially owning approximately 23.25% of the Company's outstanding shares, and Li beneficially owning approximately 20.64% of the Company's outstanding shares.

44.   The Company depends on Hou and Li for the Company's continued research, development, and growth.  As stated in the Company's latest Annual Report filed on Form 10-K (the "2011 Form 10-K") with the SEC on March 30, 2012:

**The loss of certain employees that are essential to our business could have a material adverse effect on our results of operations.**

Li Qiang, Chief Executive Officer, HouWanchun, Chairman, and Ye Yuanjun, Chief Financial Officer are essential to our ability to continue to grow our business. Messrs. Li, Hou and Ms. Ye have established relationships within the industries in which we operate. If either of them were to leave us, our growth strategy might be hindered, which could limit our ability to increase revenue. We do not maintain key-person insurance coverage. In addition, we face competition for attracting skilled personnel. If we fail to attract and retain qualified personnel

to meet current and future needs, this could slow our ability to grow our business, which could result in a decrease in market share.

45.     The 2011 Form 10-K further discusses the serious risk posed to the Company by a conflict arising between the Company and Hou and Li as a result of their interest in the Company's Variable Interest Entities ("VIEs"):

> **The shareholders of our VIEs may have potential conflicts of interest with us, which may materially and adversely affect our business and financial condition.**
>
> Trunkbow Technologies are jointly owned by nominee shareholders, including Mr. HouWanchun, our chairman, Mr. Li Qiang, our CEO, and Mr. XieLiangyao, and Delixunda by Mr. Xin Wang and Mr. GuodongXu. Conflict of interests between these nominee shareholders of our contractually controlled entity and their duties to our company may arise. PRC law provides that a director or member of management owes a fiduciary duty to the company he directs or manages. Mr. Hou, Mr. Li, Mr. Wang and Mr. Xu must therefore act in good faith and in the best interests of our VIEs and must not use their respective positions for personal gain. These laws do not require them to consider our best interests when making decisions as a director or member of management of the contractually controlled entity. We cannot assure you that when conflicts of interest arise, these individuals will act in the best interests of our company or that conflicts of interest will be resolved in our favor. In addition, these individuals may breach or cause our contractually controlled entity to breach or refuse to renew the existing contractual arrangements that allow us to effectively control it and receive economic benefits from it. Currently, we do not have arrangements to address potential conflicts of interest between these individuals and our company and a conflict could result in these individuals as officers of our company violating fiduciary duties to us. If we cannot resolve any conflicts of interest or disputes between us and the shareholders of our VIEs, we would have to rely on legal proceedings, which could result in disruption of our business, and there would be substantial uncertainty as to the outcome of any such legal proceedings.

46.     Accordingly, Hou and Li exercise actual control over the Company and the Board.

***Hou and Li Seek To Acquire the Company at the Most Opportune Time***

47.     Despite global economic difficulties, Trunkbow has steadily reported impressive financial results. This can be seen through the Company's various year-end and quarterly

financial statements filed with the SEC. On March 30, 2012, the Company released its full-year

2011 financial highlights, revealing:

**Full Year 2011 Financial Highlights**
- Gross revenue increased 19.6% year-over-year to $29.7 million, compared with $24.8 million in 2010.
- MVAS gross revenue grew 37.7% to $17.4 million
- MPS gross revenue grew 0.8% to $12.3 million
- Gross profit increased 17.9% year-over-year to $22.9 million, compared with $19.5 million in 2010.
- Net income increased 25.1% year-over-year to $16.9 million, or $0.47 per diluted share. This compared with net income of $13.5 million, or $0.44 per diluted share, in 2010.
- As of December 31, 2011, cash and cash equivalents totaled $6.1 million, compared with $10.3 million as of December 31, 2010.
- Introduced full-year 2012 guidance of approximately $23 million in net income, representing 36% growth compared with 2011.

48.     The Company also revealed that it had partnered with China UnionPay, China's

leading bankcard association, to launch the Trunkbow UnionPay mobile payment application.

This application will enable Trunkbow to turn a new corner in the mobile-sphere, allowing

simple and secure M-commerce transactions through China's largest financial clearing house.

Speaking of these results, and the Company's promising future, Li stated:

2011 began with our initial public offering on the Nasdaq, and throughout the year we made progress against our key strategic growth objectives while generating record full-year revenue, gross profit and net income. We significantly expanded our geographic presence with wireless carriers, finishing the year with 27 platform installations in 19 provinces nationwide and signed two important software partnerships, with China Telecom and China UnionPay, which will greatly increase our subscriber penetration and position us well to ramp our merchant acquisition efforts in the new year. Through the end of 2011, approximately 1 million mobile users had made a purchase using our physical Point-of-Sale or software-based MPS technology, a number that we expect to increase dramatically in 2012 as we continue to grow our merchant network through new POS terminal installations and application partnerships.

We believe that MPS adoption presents a compelling value proposition for merchants both online and off-line, and is an important tool that can be used for customer engagement and to improve the overall purchasing experience. By integrating features such as loyalty and rewards programs, location-based

services, mobile couponing and handset-based alerts, we believe that MPS can simplify consumers' lives while helping merchants attract new shoppers and retain existing customers. We expect that the recurring revenue generated by the shift in our MPS business will provide a solid foundation for our expected 20% top-line growth in 2012. We are well positioned to build upon our leadership position in the world's largest mobile phone market, not only growing our business, but helping drive the growth of this emerging industry.

49.     Trunkbow has continued its drive towards success in 2012. On May 21, 2012, the Company released its first quarter 2012 financial results. Highlights of these results include:

**First Quarter and Recent Financial and Business Highlights**
- Gross revenue increased 33.2% year-over-year to $6.8 million, from $5.1 million in the first quarter of 2011.
- MPS gross revenue totaled $4.4 million, compared with $1.4 million in the first quarter of 2011.
- Gross profit increased 20.6% year-over-year to $5.3 million, from $4.4 million in the first quarter of 2011; gross margin was 80.0%, compared with 88.9% in the first quarter of 2011.
- Net income decreased 34.2% year-over-year to $2.2 million, or $0.06 per diluted share, compared with $3.4 million, or $0.09 per diluted share in the first quarter of 2011. The year-over-year decline in net income was attributable to a $1.3 million refund of value-added tax ("VAT") refund received in the first quarter of 2011, compared to no such refund in the first quarter of 2012. The Company received a VAT refund of approximately $1.0 million in April 2012, which it expects to recognize in the current fiscal quarter.
- As of March 31, 2012, cash and cash equivalents totaled $6.1 million, unchanged from the level as of December 31, 2011.
- Extended its cooperation with China Unicom through the deployment of a new terminal-based MPS platform in Sichuan and Heilongjiang Province.
- Partnered with the Shandong branch of China UnionPay for the development and deployment of a new online-to-offline payment system.
- Reiterated full-year 2012 net income guidance of $23 million, representing 36% growth over 2011.

50.     On August 14, 2012, the Company reported weaker financial results for its quarter ended June 30, 2012, which cause its stock price to significantly fall from a closing price of $1.26 on August 14, 2012 to close at $0.89 on August 15, 2012, and to trade below $1.00 until October 2012.

51.     On November 2, 2012, knowing that the Company's financial results in the

second quarter 2012 were temporary, Hou and Li delivered a preliminary, non-binding proposal letter to acquire all of the outstanding shares of common stock of the Company not currently owned by them for $1.46 per share in cash. Trunkbow's press release announcing the proposal stated:

> BEIJING, November 2, 2012 -- Trunkbow International Holdings Limited (NASDAQ: TBOW) ("Trunkbow" or the "Company"), a leading provider of Mobile Payment Solutions ("MPS") and Mobile Value Added Services ("MVAS") in the PRC, today announced that its board of directors has received a preliminary non-binding proposal letter, dated November 2, 2012, from HouWanchun, Chairman of the board of directors of the Company, and Li Qiang, Chief Executive Officer and a director of the Company (together, the "Consortium Members"), that proposes a "going-private" transaction involving the acquisition of all of the outstanding shares of the Company's common stock (the "Shares") not beneficially owned by the Consortium Members at a price of US$1.46 per Share in cash (the "Acquisition").

> According to the proposal letter, the Acquisition is intended to be financed with a combination of debt and equity capital. A copy of the proposal letter is attached hereto as Exhibit A.

> The Company's board of directors has formed a special committee of independent directors (the "Special Committee") consisting of Dr. Tan Kokhui, Dr. LvTingjie, and Mr. Huang Zhaoxing to consider the Acquisition. The Special Committee intends to retain financial, legal and other advisors to assist it in its review of the Acquisition.

> The Company cautions its shareholders and others considering trading in its securities that the board of directors has just received the non-binding proposal from the Consortium Members and no decisions have been made with respect to the Company's response to the proposal. There can be no assurance that any definitive offer will be made, that any agreement will be executed or that this or any other transaction will be approved or consummated. The Company does not undertake any obligation to provide any updates with respect to the Acquisition or any other transaction, except as required under applicable law.

52. On November 14, 2012, Trunkbow announced financial results for its third quarter ended September 30, 2012. Among other things, the Company's gross revenues for the quarter increased 57% year-over-year and grew to $9.0 million; gross profit for the quarter increased 78.6% year-over-year to $7.0 million; net income for the quarter totaled $3.2 million, or $0.09 per basic and diluted share, compared with $0.08 million, or $0.02 per basic and diluted share for the same period in 2011; and Trunkbow announced that it had signed an agreement to

develop and implement a new electronic payment system for China Minsheng Banking Corp., Ltd. ("CMBC") that will simplify mobile and internet payments for CMBC's credit cardholders.

53.     Trunkbow's fourth quarter and year-end 2012 financial results were similarly strong. According to its April 16, 2013 press release announcing the preliminary results for the Company's quarter and year ended December 31, 2012, during the fourth quarter of 2012, the Company achieved gross revenue of $13.6 million, an increase of 40.2% year-over-year, gross profits of $12.2 million, an increase of 47% year-over-year, and net income of $5 million, compared with $4.8 million during the same quarter in 2011.

54.     On May 2, 2013, the Company filed its Form 10-K Annual Report, reflecting that for its fiscal year ended December 31, 2012, the Company attained, among other things, net revenues of $34.77 million, an increase of 19.6% from the prior year, and gross profits of $29.66 million, an increase of 29.3% from the prior year.

55.     Although the Company's performance for the quarter ended March 31, 2013, which were announced on May 15, 2013, and the quarter ended June 30, 2013, which were announced on August 21, 2013, was lackluster and caused a temporary drop in its stock price between mid-May 2013 and September 2013, the Company resumed its drive for success during its third quarter ended September 30, 2013. According to the November 14, 2013 press release announcing Trunkbow's financial results for its third quarter 2013, the Company's gross revenue was $6.2 million and its net income was $4.1 million, or $0.11 per basic and diluted share. Further, Trunkbow's stock price resumed trading at over $1.00 per share beginning in mid-September 2013.

**The Board Enters Into the Proposed Buyout for Inadequate Consideration That Substantially Undervalues the Company**

56.     Over a year after Hou and Li made their non-binding proposal letter Li to acquire the Company for $1.46 per share, the Company announced that they had entered into the Buyout Agreement on December 10, 2013.  Pursuant to the Buyout Agreement, Hou and Li will acquire all of the outstanding shares of Trunkbow for $1.46 per share in cash – not a cent more than originally proposed. The Proposed Buyout is valued at approximately $53.7 million in the aggregate.

57.     Hou and Li seek to acquire the Company at the most opportune time when the Company is positioned for tremendous growth and its stock is undervalued.

58.     Studies show that mergers where the purchasers are insiders of the target company provide substantially less consideration to the target company's shareholders.   An August 28, 2008 article in the *New Yorker* highlights the inherent conflict that arises upon the sale of a publicly traded company to insiders. As it noted:

> Since the beginning of 2005, nearly a hundred top-level executives at public companies have participated in management buyouts, or M.B.O.s, joining private- equity investors to buy their companies from shareholders.

> * * * * *

> The executives behind these buyouts say that they're the best solution for everyone involved. Investors get a nice bump in the price of their shares-H.C.A. shareholders, for instance, are getting twenty percent more than the market price- and executive are free from the demands of cautious investors and zealous regulators.

> * * * * *

> ***What the executives in these deals don't say is that such buyouts create huge conflicts of interest.***   The C.E.O. of a public company is legally obligated to look after shareholders' interests, which in the case of selling the company means getting the highest price possible. But when that same C.E.O. is trying to buy the company, he wants to pay the lowest price possible. Companies try to get around this by having independent members of the board of directors negotiate the deal. In practice, however, directors have generally been appointed by the company's C.E.O. and have spent a good deal of time

working with him; they're hardly likely to drive a hard bargain. When the consortium led by Aramark's C.E.O. first bid for the company, for instance, it offered thirty-two dollars a share. After shareholders complained, it upped the bid by $1.80, which directors accepted. Now, that's some real haggling. *A study of buyouts over the past two years suggests that when management is the buyer it pays, on average, thirty percent less than an outside bidder.*

Even more troubling, management buyouts give executives at public companies an incentive not to maximize the value of their companies before the sale. In 1987, for instance, after the textile giant Burlington Industries was taken private by a buyout group that included top Burlington executives, it quickly sold off the company's "nonproductive assets," including ten separate divisions and a host of manufacturing plants, for well over half a billion dollars. The executives could have done those deals while Burlington was a public company. But doing them after the buyout, when they owned more of the firm, meant that they reaped more of the benefits. Similarly, management buyouts are often associated with major restructurings to make companies leaner and more profitable. With few exceptions, these restructurings could be done before buyouts. But they're not, in part because executives would rather wait until they own a bigger chunk of the company. A study of buyouts in the U.K., for instance, found C.E.O.s who planned to buy their own companies were less likely to embark on restructuring than C.E.O.s who weren't.

*Also, executives, before making a buyout offer, use accounting gimmicks to make their company's performance look worse than it really is.*In a study of more than sixty companies that went private, Sharon Katz, of the Harvard Business School, found that, in the two years preceding a management buyout, companies recorded lower than expected accounts receivable, which drove profits down. Similarly, a study by tow accounting professors found that executives pursuing M.B.O.s tended to accelerate the recognition of revenue, making their companies' performance. But these studies suggest that part of the reason is that executives were making them look bad while they were public.

* * * * *

But if management buyouts were really about the virtues of private ownership you'd expect companies that go private to stay private. The reality, though, is that, with high-profile deals, this rarely happens. Instead, after a company has been buffed and shines, it's generally taken public again. Both H.C.A. and Aramark, in fact, have gone from public to private to public, and now are private again. This suggests that management buyouts are often simply an opportunity for insiders to pick up assets on the cheap and flip them a few years later for fantastic sums. Over the past fifteen years, public companies have come up with ever more lavish performance-related pay packages, in the hopes of giving C.E.O.'s enough incentive to do their jobs and look after shareholders' interests. But why expect someone to be happy with tens of millions of dollars for putting shareholders first when he can get hundreds of millions for putting them last? (emphasis added)

59.     Further, as *The Wall Street Journal* reported on September 8, 2006, the process through which a Company is sold to insiders is generally skewed in favor of the Company's management. The Wall Street Journal article highlights this conflict as follows:

> In such cases [where a company is being sold to management], management, with all its detailed knowledge of the company, goes from being a seller striving for a high price to being a buyer looking for an attractive price. Usually the sale of a public company involves an auction or a competitive-bidding process. But when management [is involved], there often isn't such an open procedure, and the process is especially fraught with potential conflicts of interest.
>
> * * * * * * * * * *
>
> While some boards are diligent in vetting deals, the process sometimes is skewed in favor of a sale. For example, there usually is a period when other bidders can come forth with offers. But if that window is short, the likelihood of a rival bid emerging isn't large, since potential buyers won't have time to perform due diligence. Special committees charged with weighing deals also can set breakup fees that make rival bidders pay dearly to get rid of the original buyer. (Emphasis added.)

60.     The trend identified in the *New Yorker* and *Wall Street Journal* articles has been confirmed here.   The $1.46 price per share consideration offered in the Proposed Buyout is substantially lower than Trunkbow's book value of $2.70 per share as of September 30, 2013, its most recent reported quarter.

61.     After the announcement of Hou and Li's take-private proposal, an analyst on *seekingalpha.com* commented on November 8, 2012, that the proposed price is "too low." Describing the Company's lucrative future prospects as a member of China's mobile payment market, he stated:

> China will have the world's largest mobile payments market by 2015, according to a report from Kapronasia, an advisory and consulting group focused on the Chinese financial tech sector.
>
> The report, titled "Mobile Payments in China," indicated that the Chinese mobile payment market is nearly doubling in size every year and is expected to be worth more than $80 billion with 441 million active users by 2015. China has already

overtaken the US as the largest smartphone market in the world, according to Kapronasia. However, the company also noted that the penetration of smart phones in China is still low, as less than 10 percent of the total 900 million mobile phone users own a smartphone.

According to the report, mobile payment users in China reached 218 million at the end of 2011, and is expected to grow to 441 million users by the end of 2015.

62.     The article also discussed Trunkbow's relationships with companies like UnionPay, stating that such ties will place them on the cutting edge of the mobile market going forward:

China's fast-growing mobile market, combined with a large and growing consumer economy means that China is poised to become a global leader in mobile payments. Trunkbow will capture a big market share too, because of their great relationships. . .

The Trunkbow UnionPay mobile payment applet can be incorporated into any existing mobile application to facilitate simple, secure online payments from a user's mobile phone. Representative transactions include the payment of utility and other bills, purchase of lottery, movie and event tickets, online gaming credits, e-books as well as physical goods from online and brick-and-mortar merchants utilizing the applet.

With a defensible first mover advantage and strong partnerships with China's three wireless carriers and the leading clearing house UnionPay, Trunkbow is well positioned to capture market share in the booming mobile payment market.

The offered price of $1.46 doesn't give a decent valuation of the underlying value of Trunkbow. With a P/E below 5 management acquires the company almost for free.

63.     Trunkbow's financial advisor, Duff & Phelps, found Trunkbow's implied value to be higher than the proposed consideration of $1.46 per share.  For example, the *Discounted Cash Flow Analysis* yielded an implied value for Trunkbow as high as $1.57 per share. The *Selected Public Companies and Merger and Acquisition Transactions Analyses* yielded an implied value for Trunkbow as high as $1.59 per share, and the *Summary of Analyses* yielded an implied value for Trunkbow as high as $1.58 per share.

64.     The Proposed Buyout is designed to unlawfully divest Trunkbow's stockholders of a large portion of the valuable assets of the Company for inadequate consideration. Defendants know that the Company possesses numerous assets that will produce substantial revenue and earnings, which Defendants Hou and Li wish to keep for themselves. Although the Board formed a Special Committee consisting of Tan, Lv, and Huang to evaluate Hou and Li's take-private proposal, the proposal was essentially a *fait accompli* from the start because the Special Committee has been acting to appease Hou and Li, who effectively control the Company and who have no interest in a fair evaluation of their proposal.

**The Board Breached Conducted a Materially Flawed Process**

65.     Additionally, the Board conducted a materially flawed process designed from the start to be a failure.  While the Proxy Statement emphasizes that 75 parties were contacted and none indicated interest in acquiring the Company, the Board and the Special Committee understood that even if they were to find a buyer, it would be almost impossible to sell the Company to anyone other than Hou and Li.

66.     In the proposal letter to the Board, Hou and Li stated:

> We believe that the Acquisition will provide superior value to the Company's shareholders. We recognize of course that the board of directors of the Company will evaluate the Acquisition independently before it can make its determination whether to endorse it. In considering the proposed Acquisition, you should be aware that we are interested only in acquiring the outstanding Shares that we do not already own, and that we do not intend to sell our stake in the Company to a third party.

67.     By refusing to sell their combined 43.89% interest in Trunkbow, Hou and Li prevented the Board and the Special Committee from finding other potential buyers. The Special Committee and the Board noted that they found Hou and Li's stance a "potentially negative" factor they considered:

The fact that Dr. Hou and Mr. Li, who together beneficially own approximately 43.9% of the outstanding shares of Company common stock, have expressed unwillingness to sell their stakes in the Company to any third party, which (i) made special committee believe that it was unlikely that any transaction with a third party could be completed at this time and (ii) may have discouraged, and may in the future discourage, third parties from submitting alternative transaction proposals with terms and conditions, including the price, that may be superior to the merger[.]

68.     Furthermore, the Special Committee and the Board let Hou and Li dictate the process. The Proxy Statement describes Hou and Li as being "concerned" about the Company's sales in January 2013, and decided in February 2013 to suspend their take-private proposal to focus on managing the Company. The Special Committee and the Board simply went along with this, as the Proxy Statement discloses that from March 2013 to October 2013, the "proposed transaction was on hold" and the special committee members "elected not to be compensated for their service" during that time.  Instead of using that time to consider other strategic alternatives, the Board and the Special Committee simply stopped shopping the Company and halted the market check.

69.     Finally, the Board and the Special Committee failed to request any valuations or analyses from Duff & Phelps concerning the Company's continuation as a stand-alone entity or liquidation of the Company.  Without this information, the Special Committee could not have effectively negotiated with Hou and Li to obtain the best price possible for the Company or its shareholders. Indeed, this indicates that the Special Committee did not consider all strategic alternatives and instead had a controlled mindset and only considered a sale of the Company to Hou and Li.

70.     The purpose of the Proposed Buyout is to enable Hou and Li to acquire 100% equity ownership of the Company and its valuable assets for their personal benefit at the expense

of the Company's public shareholders who will be deprived of their equity investment and the benefits thereof including, among other things, the expected growth in the Company.

71.    As a result of Defendants' conduct, Trunkbow's public stockholders have been and will continue to be denied the fair process and arm's-length negotiated terms to which entitled in a sale of their Company.

**The Unduly Restrictive Deal Protection Devices**

72.    The Proposed Buyout is also unfair because as part of the Buyout Agreement, Defendants agreed to certain onerous and preclusive deal protection devices that operate conjunctively to make the Proposed Buyout a *fait accompli* and ensure that no competing offers will emerge for the Company.

73.    The Buyout Agreement contains a strict "no shop" provision that prohibits the Board from taking any meaningful action to ensure that they are in compliance with their fiduciary duties, including solicitation of alternative acquisition proposals or business combinations.

74.    Specifically, § 6.4(a) of the Buyout Agreement includes a "no solicitation" provision barring the Company from soliciting interest from other potential acquirers in order to procure a price in excess of the amount offered by Hou and Li.  Section 6.4(a) also demands that the Company terminate any and all prior or on-going discussions with other potential acquirers.

75.    The Buyout Agreement also contains a "matching right" provision, whereby the Company must promptly notify Hou and Li should it receive an unsolicited competing acquisition proposal.  Pursuant to § 6.4(b) of the Buyout Agreement, the Company must notify Hou and Li of the bidder's identity and the terms of the bidder's offer.  Thereafter, if the Board determines that the competing acquisition proposal constitutes a "Superior Proposal," § 6.4(d) of

the Buyout Agreement requires the Board to provide Hou and Li five business days to amend the terms of the Buyout Agreement to make a counter-offer so that such Superior Proposal will no longer be superior.

76.   The effect of these provisions is to prevent the Board from entering into discussions or negotiations with other potential purchasers unless the Board can first determine that the competing acquisition proposal is, in fact, "superior," and even then, the Company must provide Hou and Li with five business days to match the competing acquisition proposal. This severely limits the opportunity for a potential purchaser to emerge, and severely limits the ability of the Board from properly exercising their fiduciary duties.

77.   The Buyout Agreement further requires the Company to pay a termination fee of $1.25 million to Hou and Li in the event that the Company decides to pursue the superior competing offer. The substantial termination fee all but ensures that no competing offer will appear, as any competing bidder would essentially pay a premium for the right to provide Trunkbow stockholders with a superior offer.

78.   Ultimately, these preclusive deal protection provisions illegally restrain the Company's ability to solicit or engage in negotiations with any third party regarding a proposal to acquire all or a significant interest in the Company. The circumstances under which the Board may respond to an unsolicited written bona fide proposal for an alternative acquisition that constitutes or would reasonably be expected to constitute a superior proposal are too narrowly circumscribed to provide an effective "fiduciary out" under the circumstances.

### *The Proxy Statement Misrepresents and Omits Material Information*

79.   Compounding the unfair process and inadequacy of the consideration offered under the Proposed Buyout, on December 20, 2013, Trunkbow filed its Proxy Statement with the

SEC in an attempt to convince shareholders to approve the Proposed Buyout.The Proxy Statement fails to provide the Company's shareholders with material information and/or provides them with materially misleading information thereby rendering the shareholders unable to make an informed decision as to how to vote at the special shareholder meeting. Defendants have violated Section 14(a) and 20(a) of the Exchange Act and Rule 14a-9 promulgated thereunder, by omitting material facts necessary to render the Proxy Statement non-misleading and omissive.

80.    Notwithstanding the Board's obligation to disclose any and all material information concerning the Proposed Buyout—which is necessary for the Company's shareholders to be able to cast an informed vote at the upcoming special meeting—Defendants failed to disclose key information regarding: (a) financial forecasts of the Company considered by the Board and/or Duff & Phelps in rendering their fairness opinion; (b) the financial analyses performed by Duff & Phelps, the Board's financial advisor, in support of their fairness opinion; (c) conflicts of interest affecting Duff & Phelps; and (d) information concerning the process leading up to the announcement of the Proposed Buyout.

*Trunkbow's Financial Forecasts*

81.    Financial forecasts (sometimes referred to as projections) are among the most important information to be disclosed to shareholders, particularly where, as here, they are asked to consider whether to share in the continued upside of a company versus foregoing future returns and accepting a cash offer that undervalues the Company.

82.    Notwithstanding their materiality, the Proxy Statement fails to provide a fair summary of these management-prepared financial projections for Trunkbow for the fiscal years 2013 through 2018, which were relied upon by Duff & Phelps in performing its *Selected Public*

*Companies Analysis, Merger and Acquisition Transactions Analysis* and the *Discounted Cash Flow Analysis*, including by failing to disclose forecasts of the following line items:

      (a)    Unlevered free cash flow;

      (b)    Earnings per share;

      (c)    EBITDA;

      (d)    EBIT;

      (e)    Taxes;

      (f)    Depreciation and amortization;

      (g)    Capital expenditures; and

      (h)    Changes in working capital.

83.    The above-described forward-looking information is material because the disclosure of the financial forecasts allow shareholders to determine the value of the Company and its future business prospects and better evaluate the fairness of the consideration provided under the Proposed Buyout. Without this information in the Proxy Statement, Trunkbow shareholders cannot cast an informed vote and could be misled about the Company's future business prospects and the validity of Duff & Phelps's financial analysis.

84.    In addition, the Proxy Statement fails to disclose whether, prior to November 2013, Trunkbow management had prepared any short- or long-term projections of the Company that were provided to and/or considered by either Duff & Phelps, Hou and Li, any other potential buyer or strategic partner, the Special Committee, and/or other Board members in evaluating the Company's strategic alternatives, including a potential sale, acquisition, or business combination involving Trunkbow. If such projections exist, a fair summary of these projections should be disclosed.

*Duff & Phelps's Financial Analyses*

85.   Duff & Phelps, acting as the Board's financial advisor, performed various financial analyses in support of its "fairness opinion" concerning the adequacy of the Proposed Buyout consideration being offered to Trunkbow shareholders.  The Board, in turn, expressly cited Duff & Phelps's purported fairness opinion, which was based on its financial calculations, as one of the reasons supporting its decision to enter into the Buyout Agreement.  However, the Proxy Statement fails to provide a fair summary of the analyses underlying Duff & Phelps' fairness opinion.

86.   Shareholders are entitled to a fair summary of the analyses underlying an advisor's fairness opinion. However, the Proxy Statement inadequately discloses the underlying methodologies, key inputs, and multiples relied upon and observed by Duff & Phelps, thereby preventing Trunkbow's shareholders from adequately and on an informed basis evaluating and understanding Duff & Phelps's financial analyses and, thus, the resulting fairness opinion.

87.   With respect to Duff & Phelps's *Discounted Cash Flow Analysis*, the Proxy Statement fails to disclose:

(a)   the estimated weighted average cost of capital;

(b)   the "[f]inancial projections for the fiscal years ending in December 31, 2019 through December 31, 2022," and the "stable growth rate" achieved by the Company by the end of the fiscal year ending December 31, 2022, which were extrapolated based on the management projections and discussions with Company management, considered by Duff & Phelps in this analysis;

(c)   whether the weighted average cost of capital analysis utilized the peer group identified in the *Selected Public Companies Analysis*; and

1          (d)      the basis for selecting a terminal growth rate of 3.0% and discount rates of

2    16.0% to 18.0%.

3          88.      With respect to Duff & Phelps's *Selected Public Companies Analysis*, the Proxy

4    Statement fails to disclose:

5          (a)      the objective criteria utilized to select the two groups of companies

6    considered in the analysis;

7          (b)      the multiples observed for each of the selected companies utilized in the

8    analysis – in fact, only the two group medians and the aggregate mean and median for the

9    observed multiples of the selected companies are disclosed;

10          (c)      whether any of the multiples observed for each of the selected companies

11    were omitted by Duff & Phelps in calculating the two group medians and the aggregate mean

12    and median;

13          (d)      Duff & Phelps' basis for selecting the projected fiscal 2014 EBIT multiple

14    of 8.0x to 9.0x and the projected fiscal 2014 revenue multiple of 2.50x to 2.75x; and

15          (e)      the Company's projected EBITDA and EBIT as prepared by Trunkbow's

16    management and provided to Duff & Phelps, and as adjusted by Duff & Phelps "for purposes of

17    this analysis."

18          89.      With respect to Duff & Phelps' *M & A Transaction Analysis*, the Proxy Statement

19    fails to disclose:

20          (a)      the objective criteria utilized to select the two groups of transactions

21    considered in the analysis;

22          (b)      the target enterprise value for each of the selected transaction;

23          (c)      whether any of the selected transactions remain pending and, if so, Duff &

24

1  Phelps' rationale for selecting transactions that remained pending;

2              (d)      theobserved multiples for each of the selected transactions;

3              (e)      the relevant observed multiples for Trunkbow;

4              (f)      the extent that Duff & Phelps relied on this analysis as part of its fairness

5  opinion in light of its determination not to select valuation multiples for Trunkbow based on this

6  analysis.

7      90.     Also, with respect to both Duff & Phelps's *Selected Public Companies Analysis*

8  and *M & A Transaction Analysis*, the Proxy Statement fails to disclose Duff & Phelps' basis for

9  selecting the projected fiscal 2014 EBIT multiple of 8.0x to 9.0x and the projected fiscal 2014

10  revenue multiple of 2.50x to 2.75x.

11      91.     With respect to Duff & Phelps's *Premiums Paid Analysis*, the Proxy Statement

12  fails to disclose:

13              (a)      the actual going-private and change of control transactions considered by

14  Duff & Phelps in this analysis, including the number of transactions considered, the objective

15  criteria utilized to select those transactions, the announcement dates of the proposals for the

16  selected going-private and change of control transactions, and the announcement dates of the

17  merger agreements;

18              (b)      thenumber or percentage of transactions that were all-cash offers, all-stock

19  offers, and mixed cash-and-stock offers, which is important because the type of transaction can

20  impact the premium paid; and

21              (c)      the observed premiumsfor each of the selected transactions rather than

22  only the observed medians, including observed premiums prior to the respective announcement

23  dates of the merger proposals and the dates of the merger agreements;

24

(d)     Duff & Phelps' rationale for failing to consider the relevant trading prices for Trunkbow's stock prior to the execution of the Merger Agreement rather than prior to the announcement of Hou and Li's original proposal in November 2012 in light of the fact that Hou and Li had suspended their proposal and the Proposed Buyout was not agreed to for well over a year after the proposal was announced.

92.     In addition, the Proxy Statement fails to disclose the preliminary valuation analyses performed and presented by Duff & Phelps to the Special Committee on December 2, 2013.

*The Process Leading Up to the Execution of the Buyout Agreement*

93.     The Proxy Statement fails to disclose critical information relating to the process by which Trunkbow's Board agreed to the Proposed Buyout. Each of the following omissions is material to shareholders because their omission does not permit shareholders to determine whether the Board and management adequately represented shareholders' interests during the negotiations process.

94.     In particular, the Proxy Statement fails to disclose:

(a)     The non-independent directors that recused themselves from the special meeting of the Board on November 2, 2012;

(b)     The nature of the inquiry from Stockholder A, the discussions between the Special Committee's legal counsel and Stockholder A and the resolution, if any, of the inquiry;

(c)     The Board's knowledge of the involvement of VStone Investment Management Limited in November 2012;

(d)     The number of parties on the draft list produced by Duff & Phelps at the November 30, 2012 Special Committee meeting, the number of strategic and financial parties on the list and the significance of the Special Committee's instruction to "revise the list;"

(e)     Whether Hou or Li was involved in the discussions and meetings between Duff & Phelps and management of the Company throughout the process;

(f)     The number of potential parties to be contacted as discussed at the December 12, 2012 Special Committee meeting, the number of strategic and financial parties on the list and whether the number of parties increased or decreased as a result of the revision of the list directed by the Special Committee at the November 20, 2012 meeting;

(g)     The pertinent issues posed by the draft Buyout Agreement circulated by Hou and Li's counsel which were considered by the Special Committee at its December 12, 2012 meeting;

(h)     The number of additional potential buyers that the Special Committee instructed Duff & Phelps to contact at the January 17, 2013 Special Committee meeting, including the number of strategic versus financial buyers;

(i)     The issues raised by the draft Buyout Agreement circulated by Hou and Li's counsel on January 8, 2013;

(j)     Whether and when Hou and Li indicated to other Board members or the Special Committee that they had determined to suspend their proposed take-private transaction in early 2013, and the reason why Defendants failed to disclose that the proposal process had been suspended until December 2013;

(k)     What date did the Special Committee members elect not to be compensated for their service as members of the Special Committee for the period from March to October 2013, when the proposed take-private transaction was on hold;

(l)     The update on the buyer's group plan as discussed with the Special Committee at the November 7, 2013 meeting;

(m)     The basis for failing to contact any of the potential buyers contacted in early 2013 after the process started again in September 2013;

(n)     The basis for allowing Hou and Li to vote on the Proposed Buyout at the December 10, 2013 Board meeting in which the Proposed Buyout was approved; and

(o)     The basis for the Special Committee and the Board's failure to obtain financial analyses and valuations of the Company on a going concern basis or the liquidation value of the Company's assets.

### Conflicts of Interest Affecting Duff & Phelps

95.     A financial advisor plays a crucial role in mergers and acquisitions, facilitating the mechanics of the sales process, providing expertise considering the suitability of combinations with certain parties, and ultimately rendering an opinion on the fairness of a deal.

96.     It is, therefore, important to retain an advisor that is both technically qualified and not subject to any conflicts of interest. It is equally important that any potential conflicts of interest must be disclosed to a company's shareholders so that they can make assess the credibility of the work and analyses performed by the financial advisor. Indeed, if the financial advisor has conflicting interests it may impact its judgment in rendering an unbiased fairness opinion. A Company's shareholders must be given the opportunity to carefully consider a

financial advisor's proprietary financial interest in a proposed transaction in order to assess how much credence to give its analysis.

97.     Here, the Proxy Statement omits material information concerning potential conflicts affecting Duff & Phelps, which acted as the Special Committee's financial advisor, including whether Duff & Phelps (or any of its affiliates) has provided any services in the past two years for Hou and Li, VStone Investment Management Limited, China Minsheng Bank Corporation Limited, Trunkbow or any of their respective affiliates or subsidiaries, and if so, the amount of compensation received for such services;

98.     Accordingly, Plaintiff seeks injunctive and other equitable relief to prevent the irreparable injury that Company shareholders will continue to suffer absent judicial intervention.

## **CLAIMS FOR RELIEF**

### **COUNT I**

**Violations of Section 14(a) of the Exchange Act
and Rule 14a-9 Promulgated Thereunder
(Against All Defendants)**

99.     Plaintiff incorporates and realleges each and every allegation set forth above as if fully set forth herein.

100.     Defendants have issued the Proxy Statement with the intention of soliciting shareholder support for theProposedBuyout. Each of the Defendants reviewed and authorized the dissemination of the Proxy Statement which fails to provide critical information regarding, among other things, the future value of the Company, the key inputs and assumptions of the financial analyses, potential conflicts of interest of the financial advisor to the Special Committee, and the background leading up to the Proposed Buyout.

101.     In so doing, the Defendants made untrue statements of fact and omitted to state material facts necessary to make the statements made not misleading. Each of the Individual

Defendants, by virtue of their roles as officers and/or directors, were aware of the omitted information but failed to disclose such information, in violation of Section 14(a).

102.   Rule 14a-9, promulgated by the SEC pursuant to Section 14(a) of the Exchange Act, provides that such communications with shareholders shall not contain "any statement which, at the time and in the light of the circumstances under which it is made, is false or misleading with respect to any material fact, or which omits to state any material fact necessary in order to make the statements therein not false or misleading." 17 C.F.R. § 240.14a-9.

103.   Specifically, the Proxy Statement violates Section 14(a) and Rule 14a-9 because it omits material facts, including those set forth above. Moreover, in the exercise of reasonable care, Defendants knew or should have known that the Proxy Statement is materially misleading and omits material facts that are necessary to render it not misleading.

104.   The misrepresentations and omissions in the Proxy Statement are material to Plaintiff and the Class, who will be deprived of their entitlement to cast a fully informed vote if such misrepresentations and omissions are not corrected prior to the vote on the Proposed Buyout. As a direct and proximate result of Defendants' conduct, Plaintiff and other Trunkbow shareholders will be irreparably harmed.

105.   Plaintiff and the Class have no adequate remedy at law.

## COUNT II

### Violations of Section 20(a) of the Exchange Act
### (Against All Individual Defendants)

106.   Plaintiff incorporates and realleges each and every allegation set forth above as if fully set forth herein.

107.   The Individual Defendants acted as controlling persons of Trunkbow within the meaning of Section 20(a) of the Exchange Act as alleged herein. By virtue of their positions as

officers and/or directors of Trunkbow, and participation in and/or awareness of the Company's operations and/or intimate knowledge of the false statements contained in the Proxy Statement filed with the SEC, they had the power to influence and control and did influence and control, directly or indirectly, the decision making of the Company, including the content and dissemination of the various statements which Plaintiff contend are false and misleading.

108.    Each of the Individual Defendants were provided with or had unlimited access to copies of the Proxy Statement and other statements alleged by Plaintiff to be misleading prior to and/or shortly after these statements were issued and had the ability to prevent the issuance of the statements or cause the statements to be corrected.

109.    In particular, each of the Individual Defendants had direct and supervisory involvement in the day-to-day operations of the Company, and, therefore, is presumed to have had the power to control or influence the particular transactions giving rise to the securities violations alleged herein, and exercised the same. Projected financial information was reviewed by the Board periodically at meetings. The Proxy Statement at issue contains the unanimous recommendation of each of the Individual Defendants to approve the Proposed Buyout. They were, thus, directly involved in the making of this document.

110.    In addition, as the Proxy Statement sets forth at length, and as described herein, the Individual Defendants were each involved in negotiating, reviewing, and approving the Buyout Agreement. The Proxy Statement purports to describe the various issues and information that the Individual Defendants reviewed and considered. The Individual Defendants participated in drafting and/or gave their input on the content of those descriptions.

111.    By virtue of the foregoing, the Individual Defendants have violated Section 20(a) of the Exchange Act.

112.    As set forth above, the Individual Defendants had the ability to exercise control over and did control a person or persons who have each violated Section 14(a) and SEC Rule 14a-9, by their acts and omissions as alleged herein. By virtue of their positions as controlling persons, these defendants are liable pursuant to Section 20(a) of the Exchange Act. As a direct and proximate result of Individual Defendants' conduct, Plaintiff and the Class will be irreparably harmed.

113.    Plaintiff and the Class have no adequate remedy at law.

### COUNT III

**Breach of Fiduciary Duties**
**(Against All Individual Defendants)**

114.    Plaintiff incorporates and realleges each and every allegation set forth above as if fully set forth herein.

115.    The Individual Defendants have violated the fiduciary duties of care, loyalty, good faith, and independence owed to the public shareholders of Trunkbow and have acted to put their personal interests ahead of the interests of Trunkbow's shareholders.

116.    By the acts, transactions, and courses of conduct alleged herein, the Individual Defendants, individually and acting as a part of a common plan, are attempting to unfairly deprive Plaintiff and other members of the Class of the true value of their investment in Trunkbow, or have otherwise failed to conduct themselves reasonably under the circumstances for Plaintiff and other members of the Class.

117.    By the acts, transactions and courses of conduct alleged herein, the Individual Defendants have breached their fiduciary duties of undivided loyalty, due care, good faith and candor owed to the public stockholders of Trunkbow.

118.     As a result of the Individual Defendants' breaches of their fiduciary duties, Plaintiff and the Class will suffer irreparable injury in that they have not received and will not receive their fair portion of the value of Trunkbow's assets and will be prevented from benefiting from a value-maximizing transaction.

119.     Unless enjoined by this Court, the Individual Defendants will continue to breach their fiduciary duties owed to Plaintiff and the Class, and may consummate the Proposed Buyout, to the irreparable harm of the Class.

120.     Plaintiff and the Class have no adequate remedy at law.

**PRAYER FOR RELIEF**

**WHEREFORE**, Plaintiff demands judgment against defendants jointly and severally, as follows:

(A)     declaring this action to be a class action and certifying Plaintiff as the Class representative and their counsel as Class counsel;

(B)     declaring that the Proxy Statement is materially misleading and contains omissions of material fact in violation of Section 14(a) of the Exchange Act and Rule 14a-9 promulgated thereunder;

(C)     declaring that the Buyout Agreement and Proposed Buyout were entered into in breach of the Individual Defendants' fiduciary duties and is therefore unlawful and unenforceable;

(D)     enjoining, preliminarily and permanently, the Buyout Agreement and Proposed Buyout unless or until the Company adopts and implements a procedure or process to: (i) obtain the highest possible value in the best interests of Plaintiff and other Trunkbow shareholders, and (ii) provide all material disclosures to Plaintiff and all Trunkbow shareholders with which they

1   are able to make informed decisions about whether to vote their shares in favor of the proposed

2   sale of Trunkbow to insiders Hou and Li;

3        (E)    in the event that the transaction is consummated prior to the entry of this Court's

4   final judgment, rescinding it or awarding Plaintiff and the Class actual and punitive damages,

5   with pre- and post-judgment interest to Plaintiff and other members of the Class;

6        (F)    directing that Defendants account to Plaintiff and the other members of the Class

7   for all damages caused by them and account for all profits and any special benefits obtained as a

8   result of their breaches of their fiduciary duties;

9        (G)    awarding Plaintiff the costs of this action, including a reasonable allowance for

10   the fees and expenses of Plaintiff's attorneys and experts; and

11        (H)    granting Plaintiff and the other members of the Class such further relief as the

12   Court deems just and proper.

13   / / /

14   / / /

15   / / /

16   / / /

17   / / /

18   / / /

19   / / /

20   / / /

21   / / /

22   / / /

23   / / /

24

1

## JURY TRIAL DEMANDED

2

Plaintiff hereby demands a trial by jury.

3

Dated this 21ˢᵗ day of January, 2014.

4

ALDRICH LAW FIRM, LTD.

5

John P. Aldrich, Esq.

6

1601 S. Rainbow Blvd., Suite 160
Las Vegas, NV 89146

7

Telephone:  (702) 853-5490
Facsimile:  (702) 227-1975

8

Email: jaldrich@johnaldrichlawfirm.com

9

Shannon L. Hopkins , Esq.
Julia Sun, Esq.

10

**LEVI & KORSINSKY LLP**
30 Broad Street, 24ᵗʰ Floor

11

New York, New York 10004
Telephone: (212) 363-7500

12

Facsimile:  (866) 367-6510
Email: shopkins@zlk.com
          jsun@zlk.com

13

14

*Counsel for Plaintiff*

15

16

17

18

19

20

21

22

23

24

## CERTIFICATION PURSUANT TO FEDERAL SECURITIES LAWS

The undersigned certifies as follows:

1.       The undersigned has reviewed a draft complaint against Trunkbow International Holding Limited ("Trunkbow") and others and authorizes the filing thereof.

2.       The undersigned did not purchase the security that is the subject of this action at the direction of counsel or in order to participate in this lawsuit.

3.       The undersigned is willing to serve as a representative party on behalf of a class, including providing testimony at deposition and trial, if necessary.

4.       The undersigned has been, at all relevant times stated in the complaint, the owner of shares of Trunkbow common stock.

5.       The undersigned has not sought to serve or served as a class representative under the federal securities laws in the last three years.

6.       The undersigned will not accept any payment for serving as a representative party beyond the undersigned's pro rata share of any recovery, except as ordered or approved by the court, including any award for reasonable costs and expenses (including lost wages) directly relating to the representation of the class.

I hereby certify, under penalty of perjury, that the foregoing is true and correct.

DATED:       January 16, 2014

_____
BORNET OLIVIER